UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| GLENN FREDERICK BELL SR. | * | CIVIL ACTION NO. 20-1064 |
| | * | |
| VERSUS | * | SECTION: "H"(1) |
| | * | |
| ANDREW SAUL, COMMISSIONER OF | * | JUDGE JANE TRICHE MILAZZO |
| THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Glenn Frederick Bell Sr., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 21) be DENIED and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 23) be GRANTED.

**Procedural Background**

Mr. Bell applied for DIB and supplemental security income ("SSI") under Title XVI of the Act in 2012. After this application was initially denied, an Administrative Law Judge ("ALJ") issued a partially favorable ruling on March 1, 2013, concluding that Mr. Bell was disabled under the Act from August 21, 2010 through September 4, 2012. Mr. Bell filed another claim for SSI and DIB on April 30, 2014, alleging a disability onset date of March 2, 2013. This claim was denied by the state agency on June 16, 2014. There is no evidence or allegation that Mr. Bell appealed this decision.

1

On December 19, 2017, Mr. Bell applied for DIB and SSI, asserting a disability onset date of June 17, 2014. He alleged the following illnesses, injuries, or conditions: leg injury, depression, inability to stand for long periods of time.  On June 20, 2018, his claim for SSI was granted, with the agency finding an established disability onset date of December 19, 2017. On the same day, however, his claim for DIB was denied by the state agency. The Disability Determination Explanations concluded "[a]lthough you have a leg injury with difficulty standing for long periods of time and depression, there is insufficient evidence to consider you disabled prior to your date last insured of 6/30/2015."

As to his DIB claim, Mr. Bell obtained counsel and in August 2018, he requested a hearing before an ALJ. The hearing was held on May 30, 2019 at which time Mr. Bell's counsel also requested that the April 30, 2014 application for DIB be reopened, citing the fact that Mr. Bell had not been represented by counsel and arguing that the state agency did not send Mr. Bell to see a doctor or obtain any more medicals and that the state agency simply rubber stamped the ALJ's March 1, 2013 decision. On June 27, 2019, the ALJ issued an adverse decision. Mr. Bell timely appealed to the Appeals Council, which denied review on February 8, 2020.

On March 31, 2020, Mr. Bell filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record on September 10, 2020. (Rec. Docs. 13, 14). The parties filed cross-motions for summary judgment. (Rec. Docs. 21, 23). Mr. Bell is represented by counsel.

**Evidence in the Record**[1]

*Medical Records*

On January 16, 2013, Mr. Bell presented at the Interim LSU Public Hospital. R. at 365. He complained of right shoulder and knee pain for the previous nine months with gradual onset. Id. Upon physical examination of the right shoulder, he had active abduction to 90 degrees, 100 degrees passive, and forward flexion to 90 degrees. Id. Strength was 4/5 bilaterally. Id. Upon examination of his right knee, he had full extension and flexion to 110/115 degrees. Id. A steroid injection was administered for the right shoulder and right knee. R. at 366. An MRI of the right shoulder was ordered. Id. He was referred to occupational therapy for the right shoulder. Id.

At the initial occupational therapy assessment on January 28, 2013, x-ray suggestive of tendinosis was noted. R. at 370. Functional limitations were noted to be bathing, dressing, lifting, and holding. R. at 370. Decreased range of motion and pain in the right shoulder were noted. R. at 371. Mr. Bell returned to occupational therapy on February 4, 2013, but his February 14 and February 20, 2013, appointments were cancelled. R. at 373, 375, 376.

An MRI of the right shoulder was taken on March 18, 2013. R. at 377. The following impressions were noted: full-thickness 3.5 cm anteroposterior tear of the supraspinatus, high-grade partial tear of the subscapularis tendon, interstitial tendinosis of the long head of the biceps tendon, extensive capsular thickening in the anterior portion, and adhesive capsulitis suspected. R. at 379.

Mr. Bell had an appointment with Dr. Pamela Weisman at Daughters of Charity on March 25, 2013, to follow up for hypertension. R. at 491. On a review of musculoskeletal systems, it was noted that his knees showed abnormalities. R. at 492.

---

[1] Mr. Bell seeks to establish disability for the period of June 17, 2014 through June 30, 2015. The court's summary includes records from the entirety of 2014 and 2015. Because Mr. Bell has cited 2013 records in his argument, the court considers records from this period also. The court also summarizes Mr. Bell's medical records related to his knee pain in 2016 and 2017 to put the records for the relevant period in context.

Mr. Bell followed up at LSU Public Hospital for chronic right shoulder and knee pain on May 1, 2013. R. at 380. He reported that the injections had provided great relief. R. at 380. He reported improvement in pain and function with occupational therapy. Id. Range of motion in the shoulder was 160 active abduction/forward flexion; 45 for external rotation, and to T12 for internal rotation. Id. For the knee, range of motion was -5/90. Id. He had strength of 4/5 in the rotator cuff muscle with signs of impingement. R. at 381. A Kenalog injection to the right knee was given. R. at 381.

At his May 10, 2013, follow up with Dr. Weisman at Daughters of Charity for hypertension, Mr. Bell reported bilateral knee pain. R. at 489. "[N]o soft tissue swelling- edema" was noted under review of musculoskeletal systems. Id.

Mr. Bell presented at the Ochsner emergency room on May 23, 2013, complaining of lip swelling suspected to be as an allergic reaction to Lisinopril. R. at 394, 396. Upon physical exam, he was noted to have normal range of motion and no edema in his musculoskeletal systems. R. at 396.

Mr. Bell presented at the Ochsner Emergency Room on August 12, 2013, with altered mental status. R. at 400. He complained of generalized weakness, hiccups, and shortness of breath. R. at 401. Heavy daily alcohol consumption was noted, and his blood alcohol was found to be 156. R. at 405-06. He reported right knee pain that is non radiating and worsened with movement, better with rest. Id. Upon physical examination, it was noted that Mr. Bell had no lower extremity edema, negative valgus and varus, negative posterior and anterior drawer sign, and dorsalis pedis and posterior tibial pulse 2+. R. at 403. He was treated for hepatic encephalopathy and his ammonia levels and mental status improved. R. at 409. He exhibited signs of alcohol withdrawal, which were treated with Ativan. Id. His blood pressure medications were adjusted. Id. A psychiatric

evaluation was performed by Dr. Anwar Ismail. R. at 416. Mr. Bell was alert, cooperative, and oriented. R. at 417. His mood was frustrated with constricted affect. Id. He admitted to hearing voices and was paranoid and hypervigilant during the examination. Id. He was diagnosed with schizoaffective disorder, bipolar type, alcohol dependence, and alcohol withdrawal. Id. His Risperdal dosage was changed and lithium was initiated. R. at 417.

At his September 9, 2013 follow up with Dr. Weisman at Daughters of Charity for hypertension, he complained his osteoarthritis was acting up and it was noted he was being followed by orthopedics. R. at 485. "[N]o soft tissue swelling- edema" was noted under review of musculoskeletal systems. R. at 486.

Mr. Bell followed up at LSU Public Hospital on September 25, 2013 for right shoulder and knee pain. R. at 383. He reported that his shoulder range of motion had improved with exercises, but his knees continued to bother him. R. at 383. He reported that his right knee occasionally swells and makes it difficult to bear weight. Id. Another injection to the right knee was administered. R. at 384.

Mr. Bell followed up for knee pain at LSU Public Hospital on January 22, 2014. R. at 389. An injection was administered. R. at 390. Surgical possibilities were discussed, but Mr. Bell wanted to avoid surgery. Id. It was noted that the present medical management and activity modifications were satisfactory. Id. It was also noted that Mr. Bell's right shoulder pain had improved with the previous injection and physical therapy. R. at 390.

At his February 13, 2014, follow up appointment with Dr. Weisman at Daughters of Charity for hypertension, osteoarthritis of the knees was noted. R. at 573. "[N]o soft tissue swelling- edema" was noted under review of musculoskeletal systems. R. at 574. The same notes were contained in the records of Mr. Bell's May 8, 2014, follow up appointment. R. at 478. For

the remainder of 2014 and into 2015, issues with his knee or shoulder were **not** noted at eight follow up appointments with Dr. Weisman and/or an Advanced Practice Registered Nurse at Daughters of Charity until an appointment on August 21, 2015, with APRN Karen Lambousey, who noted "knees showed abnormalities . . . [d]iffuse tenderness." R. at 559-567.

Mr. Bell presented at the emergency room on March 20, 2015, complaining of upper lip swelling. R. at 783-84. He reported previous history of the symptoms but said he had not been told to stop Lisinopril. R. at 784. Upon physical examination, it was noted he had normal range of motion in his musculoskeletal system and exhibited no edema or tenderness. R. at 785. He had a normal mood and affect, his behavior was normal, and his thought content and judgment were normal. Id.

On August 19, 2015, Mr. Bell presented to University Medical Center and treated with Dr. Charles Patterson. R. at 900. Mr. Bell sought a steroid injection for knee pain. R. at 900. It was noted that apart from injections, he had been treating his pain with Advil. Id. Injections were also administered to the knee on December 2, 2015 and December 7, 2016. R. at 915, 923. X-rays of the knee were also taken at those visits. R. at 915, 922. On May 8, 2017, it was noted that the injections no longer worked and that the pain limited his activities of daily living. R. at 933, 935. Surgery was discussed but Mr. Bell was unsure if he was ready. R. at 935. On October 30, 2017, he presented with knee pain and reported he was ready for surgery. R. at 938. A steroid injection was administered bilaterally. R. at 939. He was informed that LSU orthopedics was no longer booking elective surgeries for the time being. R. at 939. He presented for an injection on April 30, 2018. R. at 948.

*Mental Health Records:*

A behavioral health assessment was performed at Magellan on October 8, 2012.[2] Mr. Bell reported a history of depression, only 2 hours of sleep per night, isolation from others, no friends, and a feeling that people are after him to harm him. R. at 443. His functional status was found to be moderately impaired. R. at 447. On October 25, 2012, Mr. Bell presented for a psychological diagnosis interview with Dr. Eric Kramer. R. at 465. He was alert and oriented with appropriate affect and eye contact and his speech was within normal limits. R. at 465. His mood was anxious and agitated. Id. His concentration was fair and his memory was intact. Id. He was diagnosed with alcohol abuse, rule out abuse versus dependence. R. at 466. Geodon and hydroxyzine were prescribed. Id.

Mr. Bell met with Dr. Harriet Lee of Magellan on January 9, 2013. R. at 467. Mr. Bell was alert and cooperative, but with a constricted affect and an anxious, dysphoric, irritable, and depressed mood. Id. His symptoms were noted to be marked. R. at 468. His concentration was good, his memory was intact. Id. His thought content was delusional and paranoid. Id. Auditory hallucinations were noted. Id. It was noted that "diagnosis seems Schizoaffective D/O, Panic D/O

---

[2] This was Mr. Bell's first appointment at Magellan, where he treated in 2013 and early 2014. Although performed by consultative rather than treating practitioners, and although not mentioned by either party, the Court takes note that in this same Fall 2012 time frame as the initial Magellan appointment, the following examinations were conducted and findings noted. Consultative examiner Dr. Sheldon Hersh prepared a report dated August 21, 2012, that focused on physical findings. R. at 353. Mr. Bell presented with a cane his brother had bought him, but Dr. Hersh found that Mr. Bell's abnormal gait was out of proportion to the physical examination findings. R. at 355. Mr. Bell's mental status was abnormal, and Dr. Hersh noted that he was agitated and confused, though not psychotic. Id. Mr. Bell had difficulty on the mental status examination, and he constantly moved his legs and kept his finger in his mouth during the examination. Id. Dr. Hersh found Mr. Bell had significant depressive symptoms. Id.
A subsequent consultative examination was performed by Dr. Richard W. Richoux, who reviewed Dr. Hersh's report and issued his own report on September 4, 2012. R. at 359. Dr. Richoux found that it was apparent that Mr. Bell was going out of his way to simulate mental illness. Id. Dr. Richoux concluded that he had never witnessed putting a finger in the mouth as a symptom or manifestation of any particular psychiatric disorder. Id. Dr. Richoux also observed Mr. Bell's leg shaking as obviously purposeful. Id. Dr. Richoux noted various discrepancies in the information Mr. Bell provided to him as compared to what Mr. Bell had told Dr. Hersh, including regarding arrest history, suicidal ideation, and prior mental health treatment. Id. Dr. Richoux concluded that Mr. Bell had no bona fide mental illness. R. at 360.

and agoraphobia." Id. Geodon was discontinued and Risperidone and Benadryl were prescribed. Id.

On February 6, 2013, Magellan licensed clinical social worker Danita Muse evaluated Mr. Bell and diagnosed bipolar I disorder, most recent episode mixed, severe with psychotic features. R. at 448, 452. She assigned a global assessment of functioning ("GAF") score of 45. R. at 452.

On July 1, 2013, Mr. Bell followed up with Dr. Lee. R. at 471. He presented with both legs shaking and he was anxious and sweating. Id.  His mood was anxious, agitated, dysphoric, and depressed. Id.  He was alert and oriented with good eye contact. Id. His concentration was good, his memory was intact. R. at 472. His thought content was delusional and paranoid. Id.  Auditory hallucinations were noted. Id. His symptoms were noted to be marked. Id.

On September 27, 2013, Mr. Bell reported that he needed to get back on his medication and requested a continuation of mental health treatment and supports. R. at 456. He presented as depressed, honest, and genuine. Id.  He endorsed sleep disturbances, visual/auditory stimulations, and suicidal thoughts without plan/intent. Id.

Mr. Bell returned to Magellan on March 24, 2014, and met with Dr. Andrew Calhoun. R. at 475. Mr. Bell reported problems with anxiety, poor sleep, depressed mood, and auditory hallucinations. Id. He was alert and orientated and his thought content was non-psychotic. Id.  His mood was anxious and dysphoric. Id.  Mr. Bell was started on Seroquel and Wellbutrin and lithium was decreased. R. at 476.

No further treatment with Magellan or another mental health services provider appears in the record.

*Hearing Testimony*

The hearing before the ALJ was held on May 30, 2019, in New Orleans, Louisiana. Mr. Bell explained that the reason he cannot work is that he cannot walk half a block and that he cannot be around people because it irritates him. R. at 47. He added that he cannot lift too far up because of his shoulder pain. Id.

Mr. Bell testified that he lives with his daughter and three of his grandchildren. R. at 48-49. He helps out with the grandchildren by helping them with homework. R. at 49-50. He has good relationships with all seven of his children, five are adults and two are small children. R. at 48. He gets along with his neighbors when he sees them. R. at 51. But he does not go out very much. R. at 52. He was asked whether he had any problems dealing with strangers like a cashier at the grocery store. R. at 53. He said he would not talk to the cashier. Id. He would just pay the cashier when they asked for the money. Id. But he denied having any fights with a cashier. Id. He said he was nervous talking to people and his attorney pointed out that his leg had been shaking for most of the hearing. R. at 53-54.

Mr. Bell testified that he takes medication for mental health issues as well as pain medication for his knees and shoulder. R. at 51-52. He reported that he had not had a shoulder injection for about two years. R. at 52. He said the injections help "a little." Id. He said he cannot lift his arm above his head. Id. He demonstrated that he could lift his arm about parallel to shoulder height. Id. He said he would feel excruciating pain if he tried to do something higher than that. Id.

Mr. Bell also testified that his doctors had recommended knee replacement surgery starting with his right knee. R. at 54. He explained that first he had to see a dentist to resolve an infection in his mouth. Id. at 54-55.

Vocational expert Patricia Ehlinger testified. R. at 58. The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work history as Mr. Bell who was limited to performing light exertional work with the following additional limitations: occasional climbing, kneeling, and crawling; frequent crouching and balancing; occasional reaching overhead with his dominant right upper extremity; an ability to understand, remember and carry out familiar detailed instructions; and an ability to interact with others on superficial work-related matters, nothing deep or penetrating. R. at 59. The vocational expert testified that such an individual would not be able to perform Mr. Bell's past work as a groundskeeper and warehouse worker. Id. However, the expert testified that such individual could perform light, unskilled work such as a laundry worker, DOT 361.687-014, SVP 2, with 200,000 jobs available in the national economy; cafeteria attendant, DOT 311.677-010, SVP 2, with 208,000 jobs available in the national economy; and food preparation worker, DOT 520.684-046, SVP 2, with 250,000 jobs available in the national economy. R. at 60.

The ALJ then asked the vocational expert to consider a hypothetical individual with the same age, education, and work history as Mr. Bell who was limited to performing sedentary work with the following additional limitations: never climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent stooping; occasional kneeling, crouching, and balancing; never crawling; occasionally reaching over head with the dominant right upper extremity; avoid exposure to vibration and workplace hazards such as heights and dangerous moving machinery; ability to understand, remember, and carry out familiar detailed instructions; and can interact with others on superficial work-related matters, nothing deep or penetrating. Id. The vocational expert testified that such an individual could not perform Mr. Bell's work. R. at 60-61.

The ALJ then asked the vocational expert to reconsider the first hypothetical and to add the additional limitation that the person would be off task 15% of the workday in addition to regularly scheduled breaks. R. at 61. The vocational expert testified that such an individual would not be able to perform any competitive employment. Id.

Mr. Bell's attorney asked the vocational expert whether an individual limited to walking two blocks before needing to rest and limited to standing for no more than four hours in an eight hour workday could perform light work. R. at 62. The vocational expert testified that these additional limitations would eliminate all jobs she identified as to hypothetical one. Id.

### Decision of the Administrative Law Judge

The ALJ first denied Mr. Bell's request to reopen his April 30, 2014, DIB claim. The ALJ noted that the 2014 decision considered Mr. Bell's osteoarthritis, hypertension, gastrointestinal complaints, schizoaffective disorder, and polysubstance abuse before detailing a residual functional capacity consistent with light exertion, including frequent stooping and climbing of ramps and stairs; occasional kneeling, crouching, crawling, and climbing of ladders, ropes, and scaffolds; and limited reaching in any direction with the right, dominant extremity. The ALJ noted that Mr. Bell's 2013 admission to Ochsner Baptist Medical Center[3] was part of the medical evidence reviewed in the 2014 decision and that, therefore, there was no good cause to reopen the April 30, 2014, application.

Next, the ALJ determined that Mr. Bell met the insured status requirements through June 30, 2015. The ALJ determined that Mr. Bell did not engage in substantial gainful activity during the period from his alleged onset date of June 17, 2014, through his date last insured. The ALJ determined that through the date last insured, Mr. Bell had the following severe impairments:

---

[3] This medical record reflects an August 12, 2013, admission to Ochsner and was, therefore, created after the previous ALJ's March 1, 2013 decision.

degenerative joint disease of the bilateral knees and right shoulder, obesity, schizoaffective disorder bipolar type, depressive disorder, and anxiety disorder. However, the ALJ concluded that through his date last insured, Mr. Bell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that through his date last insured, Mr. Bell had the residual functional capacity to perform light work as defined in 20 CFR §404.1567(b) except with the following additional limitations: he could occasionally climb, kneel, and crawl; frequently crouch and balance; occasionally reach overhead with the right dominant upper extremity; understand, remember, and carry out familiar detailed instructions; and interact with others on superficial work-related matters, nothing deep or penetrating.

The ALJ determined that Mr. Bell was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured. The ALJ determined that Mr. Bell has a high school education and is able to communicate in English. The ALJ determined that through his date last insured, Mr. Bell was unable to perform any of his past relevant work. But the ALJ concluded that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports finding Mr. Bell "not disabled" whether or not he has transferable job skills.

Relying on testimony of a vocational expert, the ALJ then determined that through his date last insured, considering his age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Mr. Bell could have performed. Thus, the ALJ determined that Mr. Bell was not under a disability as defined by the Act from June 17, 2014, the alleged onset date, through June 30, 2015, the date last insured.

**Statement of Issues on Appeal**

Issue No. 1.    Did the ALJ err in deciding not to re-open the April 30, 2014 decision?

Issue No. 2.    Did the ALJ err in finding that at all times prior to the date last insured, Mr. Bell was able to perform light duty work and able to interact with others on a superficial basis?

**Analysis**

**I.    Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.   __Entitlement to Benefits under the Act.__

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

## III.   __Re-Opening a Decision__

Under the Act, a decision or determination may be reopened for any reason within 12 months of "notice of the initial determination." 20 C.F.R. §404.988(a). A decision or determination

may also be opened within four years of "notice of the initial determination" upon a finding of good cause. Id.    §404.988(b). Subject to exceptions inapplicable here,[4] "[t]here can be "no constructive reopening after four years because [the] concept cannot extend beyond the scope of authority granted under the regulations." King v. Chater, 90 F.3d 323, 325 (8th Cir. 1996) (quoting Boock v. Shalala, 48 F.3d 348, 352 (8th Cir. 1995)); see Guillory v. Apfel, 239 F.3d 366 (5th Cir. 2000) (citing King for the conclusion that "administrative reopenings of any kind must occur within four years of the initial decision denying coverage, subject to exceptions not relevant here"). Good cause to reopen a DIB determination or decision exists if: "(1) New and material evidence is furnished; (2) A clerical error in the computation or recomputation of benefits was made; or (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R.   § 404.989(a). "Evidence is material 'only where there is a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination had it been before him.'" Cieutat v. Bowen, 824 F.2d 348, 358 (5th Cir. 1987). "For good cause to exist [under subsection (a)(3)], the error must be a *clear* one, obvious on the face of the record, and an error is clear only if it is not subject to dispute." Hanson v. Astrue, 733 F. Supp. 2d 214, 219 (D. Mass. 2010). According to the Social Security Administration's Program Operations Manual:

> An error on the face of the evidence exists when it is absolutely clear that the determination or decision was incorrect. That is, based on all the evidence in the file and any evidence of record anywhere within Social Security Administration's (SSA) records at the time we made the determination or decision, it is unmistakably certain that the determination or decision was incorrect.

---

[4] The regulations provide a list of situations in which a decision or determination may be reopened at any time, such as if it was obtained by fraud, if a person previously determined to be dead and on whose earnings record the benefits are based is found to be alive, or to correct a clerical error or error that appears on the face of the evidence that was considered when the determination was made where it is fully or partially unfavorable. Id. §404.988(c). Plaintiff does not contend, and the court does not find, that any of the listed situations are implicated here.

SSA, Program Operations Manual System GN 04010.020, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0204010020 (last accessed Jan. 19, 2021); see Mines v. Sullivan, 981 F.2d 1068, 1070–71 (9th Cir. 1992).

**IV.    Plaintiff's Appeal**.

*Issue No. 1.    Did the ALJ err in deciding not to re-open the April 30, 2014 decision?*

Mr. Bell's April 30, 2014, application for DIB was initially denied by the state agency in a determination dated June 16, 2014. The record indicates that Mr. Bell first requested that the application be reopened at the hearing on May 30, 2019. This was well over four years after the initial determination. Accordingly, as the Commissioner argues, the claim could not be reopened, even for good cause, unless one of the exceptions inapplicable here applies. Thus, the ALJ did not err in declining Bell's request to reopen the 2014 application.

But the ALJ did not deny Mr. Bell's request on this basis, instead concluding that there was no good cause to reopen April 30, 2014, claim. Mr. Bell had argued at the hearing that the claim should be reopened because Mr. Bell had not been represented by counsel and because the state agency had not obtained any new medicals. But the ALJ found that new medical records had been included in the April 30, 2014 application, citing Mr. Bell's 2013 admission to Ochsner Baptist Medical Center.

Mr. Bell now argues that the 2013 decision that he ceased to be disabled on September 4, 2012, is not supported by medical evidence. He argues that it was irrational to find that Mr. Bell "suddenly" ceased to have severe impairments on that date. He insists that this "obvious defect" along with the fact that he was not represented by counsel for the 2014 application establishes good cause for reopening the 2014 application.

As noted above, because the request to reopen was made more than four years after the initial determination, the application could only be reopened if one of the exceptions applied. No exception is alleged to apply. Even if the good cause standard applied, Mr. Bell does not point to any new or material evidence that has been furnished. Indeed, the ALJ found that new medicals records[5] had been considered by the state agency in making the 2014 decision, and Mr. Bell does not refute that. Further, to the extent Mr. Bell attempts now, for the first time, to argue that "[t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made," he has failed to identify any clear error on the face of the evidence considered in the 2014 determination.

The court finds no error in the ALJ's decision not to re-open the 2014 determination.

*Issue No. 2.*     *Did the ALJ err in finding that at all times prior to the date last insured, Mr. Bell was able to perform light duty work and able to interact with others on a superficial basis?*

Mr. Bell argues that the ALJ's decision should be reversed because he did not mention the following medical records in his decision:

- Mr. Bell's January 16, 2013, receipt of a shoulder and knee injection with positive findings on x-ray of moderate to severe arthritis, joint effusion, and myositis ossificans.

- The March 28, 2013,[6] MRI of his right shoulder.

- Mr. Bell's receipt of shoulder and knee injections on January 22, 2014, with a note of possible knee replacement surgery.

- Mr. Bell's August 12, 2013 diagnosis of hepatic encephalopathy.

- Mr. Bell's February 6, 2013, diagnosis of bipolar disorder-severe with psychotic features.

---

[5] The Disability Determination Explanation reflects consideration of numerous medical records from late 2013 and the first half of 2014. R. at 126-27.
[6] This record is actually dated March 18, 2013.

- Mr. Bell's diagnosis on August 12, 2013, with schizoaffective disorder, bipolar type, alcohol dependence, alcohol withdrawal, and a GAF of 50.

- That Mr. Bell reported suicidal thoughts on September 27, 2013 and had a bipolar diagnosis.

- Mr. Bell's June 4, 2014,[7] diagnosis noted as "seems schizoaffective D/O, panic D/O, and agoraphobia."

- Mr. Bell's May 8, 2014, treatment at Daughters of Charity for shortness of breath and arthropy in the knees.

He argues that the ALJ's failure to mention these findings before the 2014 denial shows that he did not properly consider the record.

The Commissioner responds that the ALJ considered the record as a whole and properly assessed Mr. Bell's residual functional capacity. The Commissioner argues that Mr. Bell has merely cited records outside of the relevant time period and suggests that the ALJ failed to consider these "severe findings." But, the Commissioner points out, the ALJ found that Mr. Bell had severe knee, shoulder, and mental impairments. The Commissioner argues that to the extent Mr. Bell argues that the residual functional capacity does not properly account for his functional limitations, he has failed to assert what, if any, additional limitations should have been included.

The Commissioner further argues that substantial evidence supports the ALJ's residual functional capacity assessment. The Commissioner submits that prior to his alleged onset date, Mr. Bell had chronic right shoulder and bilateral knee pain with swelling, which were relieved by injections and occupational therapy. The Commissioner cites records showing that in late 2013, Mr. Bell did not exhibit lower extremity edema, and in March 2015, a musculoskeletal examination

---

[7] Mr. Bell has cited the date this record was printed. The service date was January 9, 2013.

revealed normal range of motion with no edema or tenderness. The Commissioner adds that the ALJ considered the impact of Mr. Bell's obesity.

As to Mr. Bell's mental impairments, the Commissioner argues that Mr. Bell merely recites mental health diagnoses. The Commissioner argues that the ALJ properly considered Mr. Bell's minimal mental health history during the relevant period and nonetheless included the following limitations in his residual functional capacity: jobs that involve the ability to understand, remember, and carry out only familiar, detailed instructions and involve only superficial work-related interaction with others.

The Court agrees with the Commissioner that the ALJ's assessment of Mr. Bell's residual functional capacity is supported by substantial evidence. Although the ALJ did not specifically describe the pre-onset date MRIs, x-rays, and injections, the ALJ did refer to these records and Mr. Bell's history of chronic right shoulder and bilateral knee pain that was successfully treated with injections and physical therapy. R. at 21. This Court has also reviewed the medical records. There is no record of any injections or other treatment for knee or shoulder pain between the alleged disability onset date and Mr. Bell's date last insured. Indeed, the last mention of shoulder pain in the medical records appears to be on January 22, 2014, when Mr. Bell noted that his right shoulder pain had improved with the previous injection and physical therapy. R. at 390. That is also the last medical record reflecting a knee injection until August 19, 2015. R. at 900. At that time, it was noted that apart from injections, he had been treating his pain with Advil. Id. Although knee surgery was discussed on January 22, 2014, Mr. Bell wanted to avoid surgery and it was noted that the present medical management and activity modifications[8] were satisfactory. Id. Between the alleged disability onset date and Mr. Bell's date last insured, Mr. Bell's medical records include

---

[8] There is no further description of the activity modifications.

his visits to Daughters of Charity. Knee abnormalities were noted on March 25, 2013, and again on August 21, 2015. But during the twelve visits to Daughters of Charity in the interim, no mention of knee or shoulder pain or issues was made at 8, and at the 4 others, the review of musculoskeletal systems reflected merely as "no soft tissue swelling-edema."

Similarly, there is only one record of mental health treatment after the disability onset date: Mr. Bell's March 24, 2014, visit with Dr. Calhoun, when he reported problems with anxiety, poor sleep, depressed mood, and auditory hallucinations.[9] R. at 475. He was started on Seroquel and Wellbutrin and lithium was decreased. R. at 476. His appointments at Daughters of Charity in 2014 and 2015 contain no mental health complaints or reference to mental health treatment.

Importantly, the residual functional capacity assessed by the ALJ limited Mr. Bell to light work with additional physical and mental/behavioral limitations. Mr. Bell points to no medical record between the alleged disability onset date and his date last insured or in the months before or after that reflects the necessity of further functional limitations. The court finds the ALJ's residual functional capacity assessment is supported by substantial evidence.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 21) be DENIED and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 23) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[9] Before that, the most recent mental health treatment was six months earlier when Mr. Bell sought to get back on his medication. R. at 456.

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 28th day of January, 2021.


Janis van Meerveld
United States Magistrate Judge